IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, STATES
OF ILLINOIS, FLORIDA and GEORGIA,
and COMMONWEALTH OF
MASSACHUSETTS, *ex rel* YURY
GRENADYOR,

             Plaintiffs,

        **v.**

UKRANIAN VILLAGE PHARMACY, INC.;
PHARMALIFE, LLC; MEI SERVICES,
INC.; PHARMALIFE ATLANTA;
PHARMALIFE MINNESOTA; STORCHAK
PHARMACY, LLC; STORCHAK, LLC;              Case No. 09 C 7891
GLOBAL PHARMALIFE, LLC; BUCKHEAD
PHARMACY, INC.; PHARMALIFE          Hon. Harry D. Leinenweber
COLUMBUS; BUCKHEAD PHARMACEUTICAL
ASSOCIATION, INC.; PHARMALIFE
BOSTON; PHARMALIFE MASSACHUSETTS,
INC.; MALECON PHARMACY, INC.;
MIKHAIL BOGACHEK a/k/a MICHAEL
BOGACHEK; EDUARD BOGACHEK a/k/a
EDWARD BOGACHEK; SEMEN DINKEVICH;
SVITLANA KHARLAMOVA; VASILY
SHEVCHUK; YAROLSAW BANDURA; ALLA
BRODECH; WALTER BRODECH; EMILY
CHATSKIS; YURI CHERNY; AARON
GREENSPAN; IOURI MELNIK; RIMA
POLOTSKAYA; GALINA SABIR; YURI
SHAPIRO; ABRAM STARR; YEVGENY
TSRULNIKOV; BELLA ZARUBINSKY;
EDUARD ZINGER; and JOHN DOES 15-
200,

             Defendants.

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' Motions to Dismiss. For the reasons stated herein, the Motions are granted and the Complaint is dismissed without prejudice. Leave to replead is also granted.

## I.  BACKGROUND

The following facts are Relator Yury Grenadyor's ("Grenadyor" or "Relator") version of events, as recited in his Complaint. Grenadyor worked as a pharmacist at Defendant Ukrainian Village Pharmacy ("UV Pharmacy") in Chicago from April 2006 to October 2008. He dispensed prescription medication to customers and billed government healthcare programs such as Medicaid and Medicare for those prescriptions.

UV Pharmacy is a privately-held corporation jointly owned by Defendants Mikhail Bogachek ("M. Bogachek"), his uncle Semen "Simon" Dinkevich ("Dinkevich"), Svitlana Kharlamova ("Kharlamova") and Vasily Shevchuk ("Shevchuk"). (Shevchuk, it appears, entered a *pro se* appearance in this case but did not file an Answer or a Motion to Dismiss).

How UV Pharmacy is related to other Defendant pharmacies is not entirely clear from the Complaint, but Relator alleges Defendants M. Bogachek and Eduard Bogachek ("E. Bogachek") (collectively, "The Bogacheks") control all Defendant pharmacies (collectively, the "PharmaLife Pharmacies") so thoroughly that each pharmacy is an alter ego of The Bogacheks and thus, the pharmacies

are liable for the Bogachek's acts and vice-versa. The Bogacheks own "substantial shares of each" pharmacy. Second Amended Complaint ("SAC"), 6. The Bogacheks also exercise control over the ordering of drugs for each pharmacy, ordering wholesale through the "Buckhead Pharmacy name." *Id.* (It is unclear if this ordering through the "Buckhead Pharmacy name" takes place through Defendant Buckhead Pharmaceutical Association, Inc. d/b/a Buckhead Pharmacy, Defendant Buckhead Pharmacy, Inc., or both.)

Individual pharmacies are able to place their own orders through the Buckhead Pharmacy name, but if M. Bogachek disagrees with a pharmacy co-owner's ordering, he "berates the co-owner of the relevant location and instructs that person to handle subsequent purchases as he directs." *Id.* M. Bogachek works out of what the PharmaLife website describes as the "Corporate Headquarters" in Atlanta. He travels to each PharmaLife Pharmacy from time to time to "oversee operations." SAC 16. He is also able to alter each individual pharmacy's inventory numbers via computer from Atlanta.

Several Defendants have been voluntarily dismissed. Six pharmacy entities (doing business through seven pharmacies) remain named Defendants: (1) UV Pharmacy; (2) Storchak Pharmacy, LLC d/b/a PharmaLife Minnesota in Minneapolis, Minnesota; (3) Global PharmaLife, LLC in Creve Coeur, Missouri; (4) Buckhead Pharmaceutical Association, Inc. d/b/a Buckhead Pharmacy in

Mayfield Village and d/b/a PharmaLife Columbus in Columbus, Ohio; (5) PharmaLife Massachusetts, Inc. d/b/a PharmaLife Boston; and (6) MEI Services, Inc. d/b/a PharmaLife Atlanta.

Relator alleges multiple types of fraud, but the most particularly pled involves the deliberate, systematic failure of UV Pharmacy to charge customers a copayment ("copay") for their prescription drugs, without regard to the customers' ability or inability to pay it. This, Relator alleges, violates the federal Anti-Kickback Statute (the "AKS"). 42 U.S.C. § 1320(b).

Specifically, the Complaint documents that on October 19, 2006, a 78-year-old Palatine woman purchased a 30-day supply of Plavix 75 mg. tablets via Medicare at UV Pharmacy. It notes that "PharmaLife" waived the $1 dollar copay, but does not identify which employee waived it. It notes Medicare was subsequently charged $102 for filling this prescription, but does not identify the specific invoice by which the government was charged, the date upon which it was charged, or the employee who submitted the claim to the federal government.

The Complaint lists 11 other examples of copay waivers (for a total of 7 customers), each example equally detailed as to the exact day of the copay waiver, the type of drug purchased, the age and gender of the customer, the exact amount of the copay waived, whether Medicare or Medicaid was billed, and (with two exceptions

where approximate dollar amounts were used) the exact amount the government paid for each prescription.

Relator does not allege that UV Pharmacy or its agents certified in writing, prior to billing Medicaid or Medicare, that it would abide by the Anti-Kickback Statute. However, he does allege that "[c]ompliance with the AKS is a material requirement of the Medicare and Medicaid programs" (SAC 8) and that "as a result of all these kickbacks, all of the claims for reimbursement of those prescriptions were false under the AKS. This falsity was material to the government's decision to pay those claims. If the government had known that those claims were false, it would not have paid them." SAC 22.

Relator does not cite specific examples of copay waivers at the other Defendant pharmacies, but puts forth related allegations in regards to each location. For example, in regards to PharmaLife Minnesota, Relator quotes "Confidential Witness 'B'," a PharmaLife Minnesota employee, who avers that copay waivers were standard practice for Medicare and Medicaid prescriptions, without regard to the customer's ability to pay. In the case of Global PharmaLife in Missouri, the Complaint quotes a named employee on a specific date reiterating on the telephone the pharmacy's policy of waiving copays.

Relator further alleges UV Pharmacy included customer "inducements" with each prescription it delivered. The standard

inducement package consisted of a tin of caviar, a packet of whole grains, a tin of Riga sprats (oil-packed fish) and a Russian-language television guide. (The pharmacies cater to Russian clientele.) Defendant Kharlamova instructed pharmacy employees to keep a logbook of the inducements delivered, and customers would call to complain when any part of the standard package was missing. Customers with multiple prescriptions got additional tins of caviar (a "bonus" inducement package). The standard package, if delivered on the typical schedule of once a month, had a yearly cost of at least $150; the bonus package cost at least $250 annually. Relator avers he and "Confidential Witness 'A'" routinely saw these inducement gifts being distributed, but does not cite a specific example of an inducement package being delivered to any one customer.

Relator alleges that over-the-counter medicines were also routinely given without cost to Medicare and Medicaid customers as inducements. On April 21, 2008, "PharmaLife" gave a 68-year-old woman in Chicago a free 60-day supply of docusate sodium, a laxative, at no charge as an inducement when she filled her Medicare Lipitor prescriptions at the pharmacy. The government was charged $194.91 for the Lipitor. The Complaint does not say which employee gave the woman the laxative, or when or who billed the government.

As evidence that inducements were used at all Defendant pharmacies, Relator cites to a 2007 or 2008 visit by M. Bogachek in which he complained the UV Pharmacy inducements were much more expensive than the Atlanta location's inducements. Dinkevich, Kharlamova and Shevchuk explained to him that the local competition was so fierce they had to keep the inducements at their current level to retain customers' business. In relation to the Minnesota location, Relator again quotes "Confidential Witness 'B'" as witnessing the standard practice of delivering customers inducements of free $20 gift certificates redeemable at Russian-centric stores. At each other pharmacy, Relator quotes a specific named employee stating over the telephone, on a specific date, that delivery of such inducements are standard policy.

Relator also alleges UV Pharmacy paid kickbacks by check to Chicago physicians of at least $1 for every prescription filled at the pharmacy. Eleven specific doctors are named as receiving such kickbacks. Relator quotes "Confidential Witness 'A'" as having personally seen such checks and monthly prescription reports used to calculate the check amounts. The Complaint notes specific numbers of prescriptions written by the named doctors for a one-year period preceding July 18, 2008. For example, Dr. Emily Chatskis wrote 7,427 prescriptions filled at UV Pharmacy in that time period. But the Complaint does not note any one specific

kickback check, any check amount, who issued it, or how or when it was delivered.

The Complaint alleges these same doctors were induced to write prescriptions each year through the delivery of gifts of cognac, wine, and dark chocolate delivered near the end of the calendar year. Exact dates are not given.

Relator attempts to extrapolate the doctor kickback fraud beyond UV Pharmacy by alleging the Atlanta pharmacy has a doctor literally on the payroll who "upon information and belief" receives kickbacks like those paid at the Chicago location.

The UV Pharmacy would also routinely recycle prescriptions that were not picked up by customers, double-charging Medicare and Medicaid for both the customer who did not pick up the prescription and the one who did. Again, however, no one specific instance of prescription recycling is identified.

Relator alleges that each pharmacy has its own "National Supplier Clearinghouse" provider number that is used in billing Medicare and Medicaid for Durable Medical Equipment ("DME"). The application form for the number specifically admonishes DME suppliers they may not "allow another entity to use its Medicare Supplier Billing Number." SAC 33. Nonetheless, UV Pharmacy used the Atlanta pharmacy's number to bill Medicare and Medicaid for diabetic supplies it ordered. Again, however, no specific examples of such use are given.

UV Pharmacy would also produce for indigent customers false records of their copayments, indicating the customers had made copayments when they, in fact, had not. This allowed the customers to remain eligible for income-based federal programs by allowing them to falsify their yearly medical expenses.

Relator alleges the Bogacheks, Dinkevich, Kharlamova and Shevchuk were happy with his work for years and offered him a chance to invest. However, when he told them in two meetings in the summer of 2008 that he was concerned about UV Pharmacy's "fraudulent business practices," things changed. SAC 34. Relator alleges that M. Bogachek, Dinkevich, and Kharlamova as a group told him (on an unspecified date) that he was "asking too many questions." SAC 35. His hours were cut to part-time in August or September of 2008 and he was fired in October 2008. The Complaint does not say who cut his hours or fired him. But on several occasions in the summer and early fall of 2008, Kharlamova threatened Relator, admonishing him not to tell authorities about their schemes, noting that she and other unspecified Defendants "know where to find [Relator]" and "know where [Relator] live[s]." *Id.*

Relator alleges the following counts: (1) violation of the False Claims Act, 37 U.S.C. § 3729(a)(1)(A), for knowingly presenting false or fraudulent claims; (2) violation of the False Claims Act, 37 U.S.C. § 3729(a)(1)(B), for knowingly making or

using a false record or statement to get a false or fraudulent claim paid or approved; (3) violation of the False Claims Act 37 U.S.C. § 3729(a)(1)(C), for conspiracy to submit false claims; (4) violation of the False Claims Act, 37 U.S.C. § 3730(h) for retaliation; (5) violation of the Illinois Whistleblower Reward and Protection Act, 740 ILL. COMP. STAT. § 175/1 *et seq.* ("IWRPA") for retaliation; (6) violation of the IWRPA for knowingly causing false claims to be presented to the state of Illinois; (Count 7 was dropped due the voluntary dismissal of a Florida entity); (8) violation of the Georgia State False Medicaid Claims Act, Ga. Code § 49-4-169 *et seq.*; and (9) violation of the Massachusetts False Claims Act, Mass. Gen. Laws Chap. 12 § 5(A) *et seq*. Each count is alleged against each Defendant, except Counts 4 and 5, which are alleged against M. Bogachek, Dinkevich, Kharlamova, Shevchuk and UV Pharmacy only. The United States and the various states involved have declined to intervene in this *qui tam* lawsuit.

## II.  <u>LEGAL STANDARD</u>

For purposes of a Motion to Dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded facts in the complaint and draws all inferences in a plaintiff's favor. *Cole v. Milwaukee Area Technical College Dist.*, 634 F.3d 901, 903 (7th Cir. 2011). A plaintiff need not allege "detailed factual allegations," but must offer more than conclusions or "a formulaic recitation of the

elements of the cause of action[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

However, where fraud is alleged, Federal Rule of Civil Procedure 9(b) requires a higher standard of pleading. *United States, et al. ex rel. Nehls v. Omnicare*, No. 07-5777, 2011 U.S. Dist. LEXIS 28704, at *6 (N.D. Ill. Mar. 21, 2011). The complaint must allege the who, what, when, where and how of the alleged fraud. *Id*. A plaintiff who pleads a fraudulent scheme involving numerous transactions over a period of years need not plead specifics with respect to every instance of fraud, but he must at least provide representative examples. *Mason v. Medline Indus.*, 731 F.Supp.2d 730, 735 (N.D. Ill. 2010).

### III. **ANALYSIS**

#### A. **Federal and State Fraud Counts (I-III, XI-IX)**

Defendants object that the waiver of copayments is not prohibited by the FCA *per se*, and that Relator failed to plead all the conditions necessary, under the AKS, that make waiver of copayments illegal. This argument is a non-starter. The AKS prohibits offering or paying any remuneration "to any person to induce such person to purchase . . . any good . . . for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(B). The statute does provide an exception for waiver of co-payments by pharmacies (42 U.S.C. § 1320a-7b(b)(3)(G)), but spells out explicit requirements for such

waiver under Section 1128A(i)(6)(A) of the Social Security Act (42 U.S.C. § 1320a-7a(i)(6)(A)).  That section, in turn, explicitly notes that "[t]he term 'remuneration' includes the waiver of coinsurance and deductible amounts . . . and transfers of items or services for free or for other than fair market value."  *Id.*  It requires that providers "not routinely waive coinsurance," that they not do it "as part of any advertisement or solicitation" and that they "determin[e] in good faith that the individual is in financial need."  *Id.*  Plaintiffs are not required to plead around every possible defense in a complaint, but even if they were, it seems Relator has done so in this respect.  He specifically alleged the copay waivers were done as part of over-the-phone solicitations, routinely and without regard to customers' financial needs.

In regards to the inducement packages of fish, whole grains and caviar, Defendants contend such remuneration is *de minimis*. This is a colorable argument, given that there is some allowance for nominal gifts in federal regulations.

In discussing its rulemaking, the Health and Human Services Office of Inspector General wrote, "We believe that incentives that are only nominal in value are not prohibited by the statute, and therefore no [regulatory] exception is necessary."  Waivers of Coinsurance and Deductibles, 65 Fed. Reg. 81, 24403, 81, 24411 (April 26, 2000).  However, this regulatory discussion of "nominal

value" goes on to state that "we are interpreting nominal value to be no more than $10 per item, or $50 in the aggregate on an annual basis." *Id.* Relator has alleged the inducements given at UV Pharmacy were worth at least $150 annually, which, if alleged with sufficient particularity, would be enough to state a cause of action.

But particularity is one area where Relator fails. Specifics are required in pleading fraud to "assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). Particularity has often been interpreted as more than just general accusations of wrongdoing, but providing at least one specific instance of wrongdoing that satisfies the who, what, where, when and how requirements of Rule 9(b). *See United States ex rel. Hebert v. Dizney*, 295 Fed.Appx. 717, 722-723 (rejecting False Claim Act claim where relator alleged a general policy of waiving copays, but failed to cite any example with specificity).

The Court finds that Relator has not met the Rule 9(b) specificity requirements with regards to the allegations concerning several fraud categories, including the allegations involving cash and gift kickbacks to physicians, prescription recycling, falsified customer copay records being issued to customers, and the use of another pharmacy's Medicare Supplier Billing Number. In all these

categories, no single instance is definitively identified. For instance, in regards to doctor kickbacks, the allegations are that an employee saw prescription reports detailing prescriptions per doctor and that checks that were issued to doctors for those prescriptions (although no specific check or payment is ever identified). There is no linkage of a specified kickback check to a specified prescription or to a specified patient. Nor is a specific check ever linked to a specified doctor (although a group of specified doctors are named), on a specified date, upon order of a specific employee.

Similarly, detail is lacking regarding the Count III FCA conspiracy charge. There is one quasi agreement detailed in respect to M. Bogachek discussing the expense of UV Pharmacy's inducements. M. Bogachek complained UV Pharmacy was spending too much on inducements. Relator then lumps Dinkevich, Kharlamova and Shevchuk together, contending they each responded that it was necessary. Defendants properly complain this is not specific enough. *Zvunca v. Motor Coach Indus. Int'l, Inc.*, 2009 U.S. Dist. LEXIS 15408, at *13 (N.D. Ill. Feb. 26, 2009) (dismissing case under Rule 9(b) for failing to identify the speaker of a fraudulent statement and instead lumping several Defendants together). Further, there is no conspiracy alleged in regard to any specific fraudulent transaction, another requirement. *See United States ex rel. Walner v. Northshore Univ. Healthsystem*, 660 F.Supp.2d 891,

898 (N.D. Ill. 2009) (dismissing claim under Rule 9(b) for failing to allege who agreed with whom, who filed the false claim, how they decided to file it, who made the alleged misrepresentation, how the claim was filed and how much the payment was for).

Relator comes much closer to satisfying Rule 9(b) with regard to the allegations of gifts to customers at UV Pharmacy because he provides the specific example regarding the provision of free laxatives to a specified customer on a specified date. Missing, however, is the Defendant "who." The allegation does not state who gave the laxatives to the woman, or who directed that gifts be given out for free. While identification of both of those parties may not be required, at least one certainly is.

This same defect appears in regards to the waiver of copayments. Nowhere does the Complaint specify who at UV Pharmacy waived the copayments for the specified transactions or who set the policy for waiving copayments. *See United States v. Ortho-McNeil Pharms.*, No. 03-8239, 2007 U.S. Dist. LEXIS 52666, at *12 (N.D. Ill. July 20, 2007) (finding Rule 9(b) not met when Relator failed to identify which sales representatives made false statements to doctors or which executives instructed sales representatives to make the false statements). Instead, the ultra-vague "PharmaLife" is alleged to have waived the copayments.

The Court notes, however, that it does not share Defendants' objection to the copayment allegations regarding the submission to

- 15 -

the government of a specific claim.  They argue that because Relator cannot point to a single specific billing submitted to the government, his action regarding copayments necessarily fails. While this could be an impediment in some cases, the Court agrees with Relator that this is not necessarily true if sufficient other detail is supplied.  In *United States ex rel. Lusby v. Rolls-Royce Corp.*, the Seventh Circuit reversed the dismissal of a False Claims Act complaint where a relator alleged Rolls-Royce was falsely certifying that engine parts met government contract specifications.  *Lusby*, 570 F.3d 849, 853-855 (7th Cir. 2009). Lusby alleged specific defective parts shipped on specific dates and gave specific details of payment.  However, the relator had not seen Rolls-Royce's specific invoices nor their false certification that the parts were in compliance with the contract.  Instead, he noted that the contract required, with each request for payment, submission of a specific form representing the parts were in compliance with the contract.  Thus, he inferred Rolls-Royce had to have falsely certified that contract requirements had been met. The Seventh Circuit agreed, noting that to require the level of exactitude defendants called for "takes a big bite out of *qui tam* litigation."

> "We don't think it essential for a relator to produce the
> invoices (and accompanying representations) at the outset
> of the suit.  True, it is essential to show a false
> statement.  But much knowledge is inferential . . . and
> the inference that Lusby proposes is a plausible one.
> *Id.*

At least in regards to the copay issue, the Court thinks that Grenadyor makes a similar reasonable inference that might pass muster if other details were present.  He has given exact dates, exact amounts that he infers were billed to the government, exact copay amounts waived, exact customers, their exact medication, and the exact government program that was billed (Medicare or Medicaid).

If all these details were coupled with the "who" element, it would be reasonable to infer that Medicare and Medicaid were billed for these specific transactions; to infer otherwise would mean UV Pharmacy was filling thousands of prescriptions entirely out of its own pocket.  But the "who" element is lacking, so the FCA claims are dismissed without prejudice.  The Rule 9(b) deficits also require dismissal (without prejudice) of the state fraud claims, as they also must be plead to Rule 9(b) standards.  *Ackerman*, 172 F.3d, at 470.

In addition to the "who" element, however, another key element is missing that has nothing to do with Rule 9(b), but rather Rule 12(b)(6).  Nowhere does the Complaint allege, even by inference as done in *Lusby*, that any Defendant filed a false certification in regards to the copayments.  *See Mason*, 731 F.Supp.2d at 734 ("Because [plaintiff's] claims are premised upon a false certification of statutory or regulatory compliance, he must also allege that the certification was a condition of or

prerequisite to payment by the government."). Relator alleges that *compliance* with the AKS was a prerequisite, but not that *certification of compliance* with AKS was a prerequisite. This kind of false claim has been termed an "implied false certification" claim, which does not look to the contractor's actual statements but analyzes underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment. *United States ex rel. Sharp v. E. Okla. Orthopedic Ctr.*, No. 05-572, 2009 U.S. Dist. LEXIS 15988, at *20-21 (N.D. Okla. Feb. 27, 2009).

It is doubtful that implied false certifications are recognized by the Seventh Circuit. *See United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 824 n.4 (7th Cir. 2011) ("Violations of laws, rules, or regulations alone do not create a cause of action under the FCA. It is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit."). But even if the Court could square *Yannacopoulos* with allowance of implied false certification claims, *United States ex rel. Kennedy v. Aventis Pharms., Inc.*, makes it clear that the underlying AKS won't support an implied false certification claim. *Kennedy*, 610 F.Supp.2d 938, 946-947 (N.D. Ill. Apr. 20, 2009) (ruling that "implied false certification" is viable in the Medicare context only when the underlying statute expressly states

that the provider must comply in order to be paid, and AKS does not

so expressly state.) The Court is aware that the Patient

Protection and Affordable Care Act of 2010 (the "PPACA") amended

the AKS to potentially eliminate this barrier. The PPACA amends

the AKS to state:

> [A] claim that includes items or services resulting from
> a violation of this section constitutes a false or
> fraudulent claim for purposes of subchapter III of
> chapter 37 of title 31, United States Code [the FCA].

Pub. L. 111-148, Sec. 6402(f) (codified at 42 U.S.C. § 1320a-

7b(g)). However, there is no indication Plaintiff relies on this

amendment; indeed, Relator's specific-transaction allegations

regarding copayments concern pre-amendment acts in the 2006-2008

time period. Additionally, the Supreme Court case suggests that

the amendment would not be retroactive in this case. *See Graham

Cnty. Soil & Water Conservation Dist. V. United States*, 130 S.Ct.

1396, 1400 n.1 (2010). Relator must allege false certification if

he repleads.

With so much already lacking, the Court will not continue

through each and every objection of Defendants, except to say that

it shares their concern that Relator's description of the Defendant

corporate entities and their association with one another seems

exceptionally murky. Also cloudy is his theory of simultaneous

agency liability and conspiracy liability. Defendant Storchak

Pharmacy LLC makes a persuasive argument that the individual

defendant pharmacies must either be co-conspirators of the

Bogacheks or agents of them, but cannot be both.  Def. Storchak Pharmacy, LLC's Reply, 2-3.  This at least should be addressed if Relator decides to replead, as should the arguments about Relator lumping Defendants together haphazardly.

## B.  Retaliation Counts (IV & V)

Relator alleges after he brought his concerns of fraudulent conduct to the individual defendants, his hours were reduced and he was eventually fired.  The FCA, however, only protects an employee for "lawful acts done by the employee . . . in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed."  *Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 478 (7th Cir. 2004).  Plaintiff cites *Fanslow* for the proposition that an employee need not tell an employer he plans to institute a *qui tam* lawsuit to enjoy this section's protection.  This is correct.  But in *Fanslow*, the employee was protected because he was engaging in *investigation* of a possible FCA claim and for *refusing* to participate in the fraud, both of which are protected acts. Relator has not alleged he was fired for investigation or refusing to participate, but merely for discussing his concerns with his employers.  That alone is insufficient.  *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002).

The Court can find no case law on whether the IWRPA retaliation provision was intended to have a different

interpretation and application than the FCA's retaliation provision, Plaintiff does not so argue, so the Court considers the issue waived and the state count is also dismissed.

## C.  Leave to Replead

Relator has sought leave to amend his Complaint.  Defendants argue that, with this being Relator's third try, the Court should dismiss with prejudice.  However, the Court notes that this is the first complaint actually challenged by motions to dismiss.  Because Defendants have only had to answer once, and because the Court does not believe amendment would necessarily be futile, it grants leave to replead.  But the Court notes that repeated failure to cure pleading deficiencies may be grounds to deny amendment.  *Johnson v. Cypress Hill*, 641 F.3d 867, 871-872 (7th Cir. 2011).  Defendants have put Relator on notice of several deficiencies, and he should be diligent about addressing them in any new complaint.

## IV.  <u>CONCLUSION</u>

For the reasons stated herein, Defendants' Motions to Dismiss are granted and the Complaint is dismissed without prejudice. Plaintiff's Request for Leave to Replead is also granted.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** 9/5/2012